**Dennis BREITENFELDT, Plaintiff,**

v.

**LONG PRAIRIE PACKING COMPANY, INC.,
Defendant.**

**No. Civ. 97–1615 (DWF/AJB).**

United States District Court,
D. Minnesota.

April 28, 1999.

Judith K. Schermer, Schermer & Schermer, P.A., Minneapolis, MN, appeared on behalf of the plaintiff.

David L. Hashmall, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, MN, appeared on behalf of defendant.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on March 5, 1999, pursuant to Defendants' Motion for Summary Judgment on all claims. In the Complaint, Plaintiff alleges sex discrimination in violation of Title VII and the Minnesota Human Rights Act (M.H.R.A.), retaliation in violation of Title VII and the M.H.R.A., disability discrimination in violation of the Americans with Disabilities Act (A.D.A.) and the M.H.R.A., worker's compensation retaliation in violation of Minn.Stat. § 176.82, and the common law claims of negligent supervision and negligent retention. For the reasons set forth below, Defendant's motion is granted in part and denied in part.

### Background

Defendant corporation is a meat packing plant. Dennis Breitenfeldt, a white male, was employed by Defendant as a "boner" from May 1990 until his termination in June of 1996. During that time Plaintiff was subjected to repeated incidents of what he and the other employees of Defendant refer to as "violating." This "violating" consisted of a variety of sexually explicit and violent acts including but certainly not limited to: groups of men jumping the Plaintiff, holding him down (sometimes in a bin of raw meat or a trough of blood), and simulating oral and anal sex acts; grabbing or hitting Plaintiff's testicles; forcing and rubbing a "steel" (the rod used to sharpen knives) between the Plaintiff's legs; and verbal harassment regarding the Plaintiff's sexual practices (calling him "Fargo Fag," asking him if he preferred "it up the ass or down the throat," etc.). From the description in Plaintiff's affidavit, which for purposes of this motion we must take as accurate, this obscene physical and verbal abuse was a daily phenomenon—he was often jumped multiple times in one day and the verbal harassment was continuous—and was perpetrated by co-workers as well as at least one supervisor (Mike Rist).

Breitenfeldt complained to one other supervisor (John Hanson) directly. Breitenfeldt told Hanson that a light above his work station was flickering and that every time it did so his co-workers would yell "blue light special!," jump him, and simulate sex acts; Breitenfeldt asked that the bulb be changed. According to Plaintiff, Hanson indicated that the sexual behavior was just in good fun and refused to change the bulb; moreover, Hanson allegedly threatened Plaintiff's job should he ever complain again. The "blue light special" violations continued unabated until the defective bulb burned out.

Breitenfeldt maintains that the practice of violating was not limited to him, but, in fact, several of the male employees were subjected to this behavior to a greater or lesser extent.

Defendant maintains that Breitenfeldt engaged in violating behavior as well; Breitenfeldt denies violating anyone. Instead, he admits that he shoved or pushed co-workers who were attacking him, but he

claims he never engaged in any sexual behavior.

Plaintiff is legally blind in one eye; as a result, he has no depth perception. To the extent that his loss of vision affects his ability to perform certain tasks, the Defendant accommodated him. However, both supervisors (Hanson and Rist) apparently began, calling the Plaintiff "One–Eyed Bitch" and "Cyclops." Mr. Rist's repertoire of insults was more diverse; he also called Plaintiff "One–Eyed Fucker," "One–Eyed Faggot," and "Blind Fucker." Furthermore, according to Plaintiff, Rist would mimic the manner in which Plaintiff tilted his head to compensate for his vision problems; this prompted general laughter in the slaughterhouse.

In April of 1996, Plaintiff substantiated the sexual harassment claims of a co-employee, Louise Lindquist.[1] Shortly thereafter, Plaintiff alleges that Hanson demanded that Plaintiff begin to wear safety glasses; according to Plaintiff, no one else on the boning floor wore safety glasses. When confronted with this disparity, Hanson allegedly replied, "we don't give a fuck about your worthless ass, we are worried about you blind fucker stabbing someone else."

The plant apparently had a program by which crews without accidents were rewarded with donuts and bingo (with cash prizes). In April of 1996, Plaintiff was injured on the job when he tore a muscle in his back. According to Plaintiff, when he reported the injury, he was threatened with termination if he left the plant because it would jeopardize the crew's bonus. Moreover, according to Plaintiff, the plant supervisors consistently refused to honor the restrictions placed on him by his injury, even when he brought in a note from a doctor. When he would call in sick because of back pain, he would be questioned whether the pain was from either too much or not enough sexual activity. When Plaintiff would take the required rest breaks in the break room, he would be "violated." He began going to his home (across the street from the packing plant) for his breaks. Plaintiff further alleges that his pay rate was reduced after his injury.

On June 21, 1996, after a day and a half of work on a "high stand" (which apparently is quite cold and physically demanding), using a 2lb knife to scrape 140–200 carcasses every hour, and without the frequent breaks suggested by his physician, Plaintiff took his scheduled break at 8 a.m. and went home. He laid down on his couch. He reports that, after laying down, he was unable to get back up because his pain was so severe. He called in to Andrea Byers at the plant to indicate his inability to return to work. Byers insisted that Plaintiff return to work to punch out, claimed she no longer had a copy of his restrictions, and indicated that she would have to talk to him about seeing a doctor again. Plaintiff maintains that at the close of the conversation Byers indicated that she would report that he had called in sick and sign him out. When Plaintiff came into work the following Monday (June 24, 1996), he was terminated for his failure to punch out and "insubordination" in refusing to follow Ms. Byers' command that he return to the plant. Plaintiff claims that over the years of his employment he witnessed many people leave without punching out, and none of them had been fired.

Defendant asserts that Plaintiff was fired for failing to follow company procedures for punching out and for repeated instances of insubordination (notably, hitting, attempting to hit, and attempting to stab several co-employees).

One month after he was terminated, Defendant sent Plaintiff a written offer for reinstatement. Plaintiff declined that of-

---

1. Ms. Lindquist alleged that a supervisor had exposed himself to her upwards of 20 times and made lewd suggestions. Plaintiff substantiated these claims during an internal investigation; at that time he also complained of the harassing behavior he was experiencing. The supervisor who harassed Ms. Lindquist was fired.

fer, supposedly because: (1) he thought that the offer required him to admit some wrong doing; (2) he did not trust the motives of Defendant; and (3) he was uncomfortable with the idea of returning to that environment (especially after having been discharged).

## Discussion

### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957.

### 2. Sex Discrimination Claims

■ *Complicity:* Defendant argues that Plaintiff engaged in the type of activity of which he now complains and that he is therefore barred from bringing a suit based upon that activity. In support of the contention that Plaintiff was complicit in the violating which occurred at Long Prairie, Defendant notes that Plaintiff admits to having engaged in physical altercations (pushing, hitting, and stabbing) with Bob Muggs, Randy Myrum, Jesse Gray Bear, and Craig Johnson (four co-workers) and that he pinned Tim Soule (another co-worker) to a table. Plaintiff maintains that these physical altercations were defensive in nature; he does not recall pressing his pelvis against Mr. Soule (as alleged by Defendant). Although Plaintiff states that his pelvis may have pressed against Mr. Soule during their altercation, a factfinder could conclude that the statement is not an admission of intent on the part of Defendant. Moreover, Defendant alleges that Plaintiff discussed sexual encounters with his co-workers; however, Plaintiff's deposition indicates that he does not recall ever having done so (he does not deny it, but he does not admit it either). Thus to the extent that Defendant argues that the allegedly discriminatory behavior was not unwanted, the Court concludes that there is a question of fact. The mere allegation that Plaintiff engaged in some physical encounters with co-workers and that he may have discussed sexual encounters with co-workers does not warrant a grant of summary judgment on behalf of Defendant.

*Timeliness:* Defendant asserts that the harassment began in 1990. At that time Plaintiff felt harassed—yet he did not file a claim. According to Defendant, the statute of limitations thus began to run in 1990. Plaintiff filed claims with the Equal Employment Opportunity Commission (E.E.O.C.) and Minnesota Department of Human Rights (M.D.H.R.) in January of 1997. In Minnesota the law is quite clear that individual discriminatory acts which are part of a continuing violation start the time for reporting the entire pattern of discrimination anew with each incident:

Under that doctrine [the continuing violation doctrine], there may be redress for unlawful discriminatory acts which occurred prior to the statute of limitations period if they are related to violative acts which occurred within the statutory period. A plaintiff may challenge incidents which occurred outside the statute of limitations period if the various acts of discrimination constitute a continuing pattern of discrimination. *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable,* 3 F.3d 281, 285 (8th Cir.1993) (when Title VII violations are continuing in nature, the limitations period does not begin to run until the last occurrence of discrimination); *see also Delaware State College v. Ricks,* 449 U.S. 250, 257–58, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558–60, 97 S.Ct. 1885, 1888–90, 52 L.Ed.2d 571 (1977). Minnesota courts have adopted the continuing violation theory in discrimination cases. *See Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 441 n. 11 (Minn.1983); *Sigurdson v. Isanti County,* 448 N.W.2d 62, 68 (Minn.1989). Federal courts have recognized two types of continuing violations, a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the limitations period. *Jenson v. Eveleth Taconite Co.,* 824 F.Supp. 847, 877 (D.Minn.1993); *Laffey v. Independent School Dist. No. 625,* 806 F.Supp. 1390, 1400 (D.Minn.1992), *aff'd sub nom.,* 994 F.2d 843 (8th Cir.1993), *cert. denied,* 510 U.S. 1054, 114 S.Ct. 715, 126 L.Ed.2d 680 (1994).

*Mandy v. Minnesota Mining,* 940 F.Supp. 1463, at 1468 (D.Minn.1996).

Defendant cites *Conner v. Reckitt & Colman, Inc.,* 84 F.3d 1100, 1102 (8th Cir. 1996), for the proposition that "the statute of limitations begins to run at the time of the discriminatory act, and not when the consequences of that act become most painful." However, in *Conner* the 8th Circuit determined that where the act of discrimination was a termination, the continuing violation doctrine did not apply to the employer's continued refusal to rehire the employee; there, a woman who was terminated from her position and subsequently asked to be rehired (a request which was denied) could not claim that the firing and rehiring decision were part of a continuing violation such that the rehiring decision restarted the statute of limitations on the firing decision. In short, in *Conner,* there were two distinct incidents which were allegedly discriminatory and no claim of a hostile work environment or other ongoing discriminatory practice.

In contrast, the case before the Court suggests a long-term, constant pattern of behavior which may constitute a hostile work environment. If proven at trial, the repeated violations could be considered a continuing violation which in effect tolled the statute of limitations until the last specific incident in the violation. Accordingly, the Court finds that summary judgment is not appropriate on the grounds of timeliness.

*"Because of sex":* Finally, Defendant argues that Plaintiff's Title VII claim must fail because Plaintiff has failed to assert that he was assaulted because of his sex. In *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the U.S. Supreme Court held that same-sex sexual harassment was actionable under Title VII, and even same-sex harassment need not be motivated by sexual desire to be actionable. The Court went on, however, to note that the explicit extension of Title VII to same-sex harassment did not transform Title VII into a "general civility code."

We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether

members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

*Oncale,* 118 S.Ct. at 1002 (quoting Justice Ginsburg's concurrence in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).[2]

Defendant argues that Plaintiff has failed to provide any evidence that his treatment at Long Prairie Packing was "because of sex." Defendant points to Plaintiff's own deposition in which Plaintiff states that he does not know why his co-workers and supervisors did what they did, that he does not know whether they treated him the way that they did because he was a man. Moreover, Plaintiff's deposition testimony admits that he observed women, as well as many other men, being touched in offensive ways. According to Defendant, Plaintiff's own deposition utterly undermines any claim that Plaintiff was exposed to a sexually discriminatory hostile work environment.

The Court disagrees. With respect to motivation, Plaintiff's deposition simply indicates that he does not know what his co-workers and supervisors were thinking when they repeatedly assaulted him in obscene, humiliating, and potentially dangerous ways. However, a reasonable fact-finder could conclude from the sexually explicit quality of the verbal and physical assaults, especially the frequent references to homosexual sex acts, that Plaintiff's gender was one motivating factor of the offensive behavior.

The Court recognizes the facial validity of Defendant's argument that men and women were all treated in a sexually explicit and offensive manner. However, the Court concludes from its review of the record that a finder of fact could conclude that men and women were treated in a qualitatively different way and that men— at least some men, the men perceived as vulnerable—were at a distinct disadvantage because of their gender. The "inappropriate touching" of women described by Plaintiff involved male supervisors and co-workers draping their arms around women and making suggestive comments; it did not, based upon the record before the Court, involve simulation of anal sex, simulation of oral sex, physical restraint by whole groups of men, or painful physical assault on their genitalia. While the Court is mindful of the Supreme Court's admonition that Title VII is not a "general civility code," the facts presented in the record, viewed in the light most favorable to the Plaintiff, could support a finding that Plaintiff was exposed to a sexually hostile work environment *because of his sex,* a work environment so beyond the pale, so beyond the bounds of decency and propriety, that it could be actionable under Title VII.

### 3. Title VII and M.H.R.A. Retaliation Claims

Plaintiff has asserted that he was retaliated against for his opposition to discriminatory practices forbidden by Title VII and the M.H.R.A. Defendant asserts that the claims for retaliation in violation of the M.H.R.A. and Title VII must fail because Breitenfeldt's internal complaints and participation in an internal investigation were not protected activity. Defendant further

---

**2.** Note, however, that the "because of sex" restriction to Title VII claims does not extend to Plaintiff's claims under the Minnesota Human Rights Act. On this point, the Minnesota courts have parted company with the federal courts to hold that a claim for sexual harassment (even same-sex sexual harassment) under the M.H.R.A. need not be predicated on either a showing that the unwelcome behavior was motivated by sexual desire or a showing that men and women were treated differ-

ently. *Cummings v. Koehnen,* 568 N.W.2d 418 (Minn.1997). The *Cummings* case, in fact, involved facts strikingly similar to the ones articulated here. The Minnesota Supreme Court held that the definition of sexual harassment in the M.H.R.A. was sufficiently broad to prohibit same-sex sexual intimidation, even if both men and women were subject to a pervasively hostile work environment.

argues that, even if these activities were protected within the meaning of the statutes, the two people who decided to terminate the Plaintiff were unaware of the allegedly protected activity.

In support of the contention that Plaintiff did not engage in protected activity, Defendant cites to *Clover v. Total System Services, Inc.*, 157 F.3d 824 (11th Cir. 1998), *vacated* 172 F.3d 795 (11th Cir. 1999), for the proposition that an internal investigation is not an investigation for purposes of the reprisal section of Title VII. *Clover* does indeed hold this; assuming the Court were to adopt the *Clover* reasoning,[3] the mere fact that Plaintiff "testified" in the internal investigation of Ms. Lindquist's allegations is not sufficient to invoke the "participated in an investigation" clause of the reprisal statute. However, the statute also prohibits reprisal or retaliation against an employee who "opposes" a practice forbidden by Title VII (or the M.H.R.A.). *See, e.g., Thompson v. Campbell*, 845 F.Supp. 665 (D.Minn.1994). Indeed, in *Clover* the court further considered—in a separate analysis—whether the plaintiff in that matter could support an "opposes" claim under Title VII; in that case, the court concluded that such a claim was not supported, but only because the complained-of activity could not reasonably be believed to violate Title VII (the complaining party must have an objectively reasonable belief that a violation occurred before they acquire statutory protection). In the analysis of the "opposes" claim, there was no concern for the fact that the plaintiff had not gone to the E.E.O.C. or the courts; instead the only question was whether a reasonable person could have believed that the complained-of activity was statutorily forbidden. *See Hearth v. Metropolitan Transit Commission*, 436 F.Supp. 685 (D.Minn.1977).

■ In the case at bar, the Plaintiff had opposed the sexually assaultive behavior of his co-workers repeatedly. He had voiced his own objections to his co-workers and supervisors and complained of the activity at the "hearing" regarding Ms. Lindquist. As the Court has already noted, a person could reasonably believe that the complained-of activity was illegal. Similarly, to the extent that Plaintiff also voiced opposition to the harassment of Ms. Lindquist, he engaged in protected activity under the "opposes" clause of the retaliation statute. Moreover, there is a genuine issue of fact regarding whether Plaintiff's objections—specifically his complaint in April of 1996—was causally related to his termination and whether the "legitimate non-discriminatory reasons" for the termination were merely pretextual.

### 4. Disability Discrimination Claims

■ To state a prima facie case for discrimination on the basis of disability under the Americans with Disabilities Act or the Minnesota Human Rights Act,[4] the Plaintiff must establish: (1) that he is disabled within the meaning of these statutes; (2) that he is qualified to perform the essential functions of the job (either with or without

---

3. The Court is not inclined to adopt the *Clover* reasoning in light of the persuasive policy argument of the dissent, not to mention the fact that the decision has been vacated.

4. The Minnesota Human Rights Act prohibits discrimination in the employment context against individuals with disabilities. Minn. Stat. § 363.03(1). The M.H.R.A. defines a person with a disability as "any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn.Stat.

§ 363.01(13). Thus, the M.H.R.A. is slightly more lenient than the A.D.A. in terms of the degree to which a person must be impaired before her condition is considered a disability. Nevertheless, the courts of the Eighth Circuit have consistently analyzed claims under the M.H.R.A. disability provision as analogous to claims under the A.D.A. *See, e.g., Miners v. Cargill Communications, Inc.*, 113 F.3d 820 (8th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997); *Roberts By and Through Rodenberg–Roberts v. Kinder-Care Learning Centers, Inc.*, 86 F.3d 844 (8th Cir.1996).

reasonable accommodation); and (3) that he suffered an adverse employment action under circumstances which could give rise to an inference of discrimination. *Gutridge v. Clure*, 153 F.3d 898, 900 (8th Cir.1998); *Young v. Warner–Jenkinson, Co., Inc.*, 152 F.3d 1018, 1021 (8th Cir. 1998). Under the ADA,

> [a]n individual is considered to have a "disability" if that individual either (1) has a physical or mental impairment which substantially limits one or more of that person's major life activities, (2) has a record of such an impairment, or (3) is regarded by the covered entity [employer] as having such an impairment.

29 C.F.R. § 1630.2(g) interpretive guidance [5]; 42 U.S.C.A. § 12102(2).

Defendant argues that Plaintiff's disability claim cannot stand because his vision impairment did not substantially limit any major life activities. To this end, they point out that Plaintiff has never been denied a driver's license because of this vision; he played football and wrestled in Junior High and perhaps high school; there were periods of time in which he did not even wear glasses (admittedly because of his vanity); and he passed the vision test given to him upon employment (though he admits he cheated on that).

Plaintiff has stated, however, that he has no depth perception and that, as a result, he declined to do "break up work." [6] When he eventually admitted to his reasons for not doing break up work "that's when all the derogatory comments started about my eyesight. That's exactly the reason why I didn't want to let them know why I couldn't do breakup [sic]. Because I'd seen how the supervisors and co-workers treat anybody with anybody [sic] type of disability, anybody that's different." (Breitenfeldt Depo., Volume 1, p. 16, lns. 14–19.)

The Defendant points to *Sweet v. Electronic Data Systems*, 1996 WL 204471 (S.D.N.Y.1996), for the proposition that a vision impairment in one eye which is correctable to an almost 20/20 level is not a disability under the A.D.A. In response, the Plaintiff cites to a 1997 8th Circuit opinion, *Doane v. City of Omaha*, 115 F.3d 624 (8th Cir.1997), *reh'g denied* (July 30, 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 693, 139 L.Ed.2d 638 (Jan. 12, 1998), which held that blindness in one eye—even when vision can be corrected to 20/20—is a disability in that the manner in which the plaintiff saw, the need for his brain to compensate for his lack of depth perception, and the need for one eye to assume the burden of seeing for the other, made him substantially different from other people with respect to the major life activity of seeing.[7] The record does not squarely support either position, that Plaintiff was substantially limited in a major life activity or that he was not; however, given the reasoning articulated by the 8th Circuit, the record does create a genuine issue of material fact with respect to whether

---

**5.** All references to the "interpretive guidance" of a Code of Federal Regulations section are to the E.E.O.C.'s interpretive guidance on that particular section, located in the Appendix to § 1630 of Chapter 29 of the Code of Federal Regulations.

**6.** Break up work apparently involves using large power saws to break apart carcasses.

**7.** These two cases are representative of an inter-circuit disagreement about the application of the E.E.O.C.'s interpretive guidance regarding the A.D.A. *See generally Sutton v. United Air Lines, Inc.*, 130 F.3d. 893 (10th Cir.1997), *cert. granted*, —— U.S. ——, 119 S.Ct. 790, 142 L.Ed.2d 653 (1999). The inter-

pretive guidance suggests that the question of whether a person is substantially limited in a major life activity should be determined without reference to any mitigating measures—such as corrective lenses—which the person might employ. A number of courts, including the court in *Sweet* and the 10th Circuit in *Sutton,* have found that the interpretive guidance is directly at odds with the statutory language of the A.D.A. Other courts, including the 8th Circuit in *Doane,* have adopted the E.E.O.C.'s position. The Supreme Court's grant of certiorari in *Sutton* may herald an end to the confusion; however, at present, this Court is bound by the 8th Circuit's decision.

Plaintiff was substantially limited in a major life activity.

Moreover, the record creates a genuine issue of material fact with respect to whether Defendant through its employees regarded Plaintiff as disabled. Congress clearly intended to protect individuals from discrimination due to the inaccurate or prejudiced perceptions of third parties that certain impairments are more debilitating than they really are; the E.E.O.C. has stated that "[a]n individual satisfies the second part of the 'regarded as' definition if the individual has an impairment that is only substantially limiting because of the attitudes of others toward the condition." 29 C.F.R. § 1630.2(*l*) interpretive guidance. The epithets hurled at Plaintiff, the mimicking of his head tilt, the requirement that he wear safety glasses, and the fact that his supervisors told him he was worthless when they learned of his vision problems could all support a conclusion that Mr. Breitenfeldt was "regarded as" substantially limited in the major life activity of seeing, whether or not he was in truth so limited, and that he is thus disabled within the meaning of the statute.[8]

Defendant further argues that a few stray remarks and teasing, even if offensive, are insufficient to give rise to a claim of hostile work environment based on disability discrimination. Again, the Court concludes that the record provides enough evidence (both from Breitenfeldt and his co-workers) to suggest that the ridicule of Plaintiff as a result of his vision problem was pervasive and effected his work environment. In short, a question of fact exists, and summary judgment is inappropriate.

## 5. Workers' Compensation Retaliation

The Plaintiff's Complaint articulates the following bases for his claim of workers' compensation retaliation: (1) that Defendant paid Plaintiff a lower wage while Plaintiff was on restricted duty; (2) that Defendant refused to abide by the work restrictions imposed by Plaintiff's physician and taunted Plaintiff for attempting to enforce those restrictions; (3) Defendant "disciplined and retaliated against the plaintiff for attending medical appointments" (Complaint at ¶ 39); and (4) Plaintiff was ultimately terminated after taking a prescribed work break in retaliation for seeking workers' compensation benefits. While the "Workers' Compensation Retaliation" count in the Complaint does not specify the statutory provision which Defendant allegedly violated, the prayer for relief indicates that the claim is based on Minn.Stat. § 176.82. Defendant argues that Plaintiff did not engage in any protected activity so as to bring him within the umbrella of section 176.82; moreover, the Defendant argues that none of the actions (with the possible exception of the termination) undertaken by Defendant violated the statute.

■ To the extent that Defendant's argument is that Defendant did not explicitly deprive Plaintiff of any benefit under the workers' compensation statute, the Court agrees. In *Minter v. Ford Motor Co.*, 827 F.Supp. 1418 (D.Minn.1993), the district court held that the provision of "suitable work" is not a benefit protected by the statute.[9] Thus, the mere failure of Defendant to provide Plaintiff with reasonable accommodations for his injuries and a position with compensation commensurate with his pre-injury pay rate is not, in and of

---

**8.** Defendant argues that there is only evidence that it regarded Plaintiff as limited with respect to one task; the Court believes this understates the situation and that there is at least a question of fact as to whether the Defendant regarded Plaintiff as disabled.

**9.** "A 'suitable job' is one that is consistent with an approved rehabilitation plan or ...

one that the employee can do in his or her physical condition and which produces an economic status as close as possible to that which the employee would have enjoyed without the disability." *Minter,* 827 F.Supp. at 1426, n. 19 (citing Minn.Stat. § 176.101, subd. 3e(b)).

itself, a denial of benefits under the statute.

However, to the extent that Defendant's argument is that Plaintiff did not apply for benefits and so Defendant could not have retaliated against Plaintiff, the Court disagrees. Plaintiff argues that Defendant terminated his employment in part in retaliation for him seeking workers' compensation benefits. In *Randall v. Northern Milk Products, Inc.*, 519 N.W.2d 456 (Minn.Ct.App.1994), the Minnesota Court of Appeals upheld a trial court finding of workers' compensation retaliation where the trial court found that the employer terminated an employee who had expressed his intention to seek workers' compensation benefits. Indeed, to hold that a claim for retaliation can survive only where the employee actually sought benefits and the adverse employment action followed would in essence reward employers for terminating employees at the first sign of injury.

The facts in the record, taken in the light most favorable to the Plaintiff, could support a finding that Defendant intentionally obstructed Plaintiff's pursuit of the benefits to which he was entitled by threatening his job, and, when Plaintiff's physical condition continued to pose problems with his ability to work, he was terminated. While the record is not entirely clear, it appears that Plaintiff never explicitly raised the issue of workers' compensation or, after his termination, sought the benefits to which he may have been entitled, the Court concludes that these factors go to the weight of the evidence in favor of Plaintiff and do not, as a matter of law, preclude his claim. Again, the Court declines to grant summary judgment on this issue.

### 6. Negligent Supervision and Negligent Retention

Defendant has argued that Plaintiff's common law claims are pre-empted by the exclusivity provision of the Minnesota Human Rights Act. Minnesota Stat-

utes § 363.11 clearly states that "as to acts declared unfair by section 363.03, the procedure herein provided shall, while pending, be exclusive." This exclusivity provision has been held to pre-empt common law claims based upon the same facts and alleging the same damages as M.H.R.A. claims while those M.H.R.A. claims are pending. *See Williams v. St. Paul Ramsey Medical Center*, 551 N.W.2d 483, 485 (Minn.1996); *Sullivan v. Spot Weld*, 560 N.W.2d 712, 717 (Minn.Ct.App.1997). Plaintiff has alleged no separate factual predicate for his common law claims; accordingly, summary judgment on those claims is appropriate.

### 7. Back Pay and Front Pay

Defendant argues that Plaintiff's claims for back and front pay should fail because Plaintiff refused Defendant's offer of reinstatement (which was made one month after he was terminated). Defendant correctly articulates the rule on back pay—and front pay—in the wake of the Supreme Court's decision in *Ford Motor Company v. Equal Employment Opportunity Commission*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982):

> "[I]n general, the relevant period for measuring backpay liability is the time between the termination and the plaintiff's action upon an offer of reinstatement. Nevertheless, if a plaintiff reasonably rejects an offer of reinstatement, then the offer does not terminate the accrual of backpay damages." The "refusal of a reinstatement offer is measured by an objective standard: 'Generally it is the duty of the trier of fact to weight the evidence to determine whether a reasonable person would refuse the offer of reinstatement.'"

*Smith v. World Insurance Co.*, 38 F.3d 1456, 1463–64 (8th Cir.1994) (*quoting Morris v. American Nat'l Can Corp.*, 952 F.2d 200, 202 (8th Cir.1991); *citing Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808 (8th Cir.1982)).

While the Defendant urges the Court to determine that the Plaintiff's rea-

sons for refusing the offer of reinstatement were, as a matter of law, objectively unreasonable, the Court declines to do so. Given the severity of the harassment described by the Plaintiff, a fact-finder could determine that Plaintiff's rejection of the offer of reinstatement was objectively reasonable. Accordingly, summary judgment on the question of appropriate measurement of damages is inappropriate.

For the reasons stated, **IT IS HEREBY ORDERED:**

Defendants' Motion for Summary Judgment (Doc. No. 57) is **denied in part** and **granted in part,** as follows:

a. Summary judgment as to the claims of negligent supervision and negligent retention is **granted,** and these claims are dismissed with prejudice.

b. Summary judgment as to all other claims is **denied.**

c. Summary judgment on the question of availability of back pay and front pay damages is **denied.**