Juan V. **GONZALEZ,** Plaintiff

v.

**CITY OF MINNEAPOLIS,** Defendant.

No. 02–710(PAM/RLE).

United States District Court,
D. Minnesota.

June 13, 2003.

Elizabeth A Cloutier, Cloutier & Cloutier, Mpls, for Plaintiff's Counsel.

Caroline Marie Bachun, Mpls City Atty, Mpls, for Defendant's Counsel.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment on Plaintiff's claims. For the following reasons, the Court grants the Motion in part and denies the Motion in part.

### BACKGROUND

Plaintiff Juan V. Gonzalez was employed by Defendant City of Minneapolis ("the City") for fifteen years as a laborer and street maintenance worker. Throughout

that time, Gonzalez suffered several serious injuries both at work and in two car accidents that had no relation to his employment. Gonzalez has undergone three separate shoulder surgeries and one neck surgery as part of the treatment for his various injuries. Gonzalez also entered a drug rehabilitation program as a result of an addiction to pain medication in November of 2000.

On March 1, 2001, Gonzalez requested time off for neck and back pain. On March 7 and 9, 2001, Gonzalez requested time off work for chronic pain. On March 12, 2001, Gonzalez called in sick after his shift had started in violation of a rule requiring employees to call in sick before the shift begins. As a result, the city held an administrative hearing on March 22, 2001, regarding Gonzalez's work performance, including the March 12 violation, excessive use of sick leave, and the use of sick leave that had yet to accrue. At the meeting the City decided to place Gonzalez on "Sick Leave Restriction," meaning that Gonzalez would have to obtain a doctor's statement to cover any time off. In addition, the City suspended Gonzalez for two days.

At the beginning of April, Gonzalez took two weeks off for health reasons without obtaining a doctor's permission. The City scheduled a meeting for April 17, 2001, to discuss this absence. Gonzalez missed that meeting and a second meeting was scheduled, this time for April 20, 2001. Gonzalez missed this meeting as well. Because he missed the April 20, 2001 meeting, the City decided to terminate Gonzalez. The City states the reason for its decision as tardiness and absenteeism, sick leave abuse, and a violation of department rules, policies, procedures or City ordinance. (Gonzalez Dep. Ex. 32.)

Gonzalez made two phone calls to his supervisor regarding the two missed meetings. In both calls, he apologized for missing the meetings and stated that he knew what the consequences would be: dismissal. He also recounted the distress in his life, stating that he felt too "emotionally spent" to attend. (Gonzalez Dep. at 69–70.) On April 17, 2001, Gonzalez received documentation from his doctor stating that he could not work from April 2 through April 22, 2001. The parties dispute when the City received the doctor's leave notice from Gonzalez.

The Court identifies the following claims in Gonzalez's Complaint. First, Gonzalez makes several retaliation claims, including retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a), the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(b)(1), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–3(a), the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.03, subd. 7, the Minnesota Workers' Compensation Act, ("WCA"), Minn.Stat. § 176.82, subd.1, and the Minneapolis Civil Rights Ordinance ("MCRO"), Minneapolis, Minn., Code of Ordinances § 139.40(1). Next, Gonzalez brings a claim for disability discrimination under the ADA, 42 U.S.C. § 12112, the WCA, Minn.Stat. § 176.82, subd.2, the MHRA, Minn.Stat. § 363.03, subd. 1, and the MCRO, § 139.40(b). Third, Gonzalez brings a claim for national origin discrimination, based on an alleged hostile work environment and disparate treatment, under Title VII, 42 U.S.C. § 2000e–2(m), the MHRA, Minn.Stat. § 363.03, subd. 1, and the MCRO, § 139.40(b). Fourth, Gonzalez also claims that he faced a hostile work environment on the basis of disability. Fifth, Gonzalez brings a claim for breach of contract based on the City's alleged failure to follow the termination procedures specified in its contract with Gonzalez. Finally, Gonzalez raises a claim

sounding in tort for negligent supervision and retention of employees. The City moves for Summary Judgment on all of Gonzalez's claims.

## DISCUSSION

### A. Standard of Review

The City moves for summary judgment pursuant to Rule 56(c), which provides that such a motion shall be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.1996). The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik v. County of LeSueur*, 47 F.3d 953, 957 (8th Cir.1995).

### B. Recent Supreme Court Decision

Prior to the recent Supreme Court decision in *Desert Palace, Inc. v. Costa*, —— U.S. ——, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), all of Gonzalez's claims for discrimination and retaliation would have been analyzed under the traditional burden-shifting paradigm articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, once a plaintiff has established a prima facie case of discrimination, the defendant has the burden to articulate a legitimate, non-discriminatory reason for its decision. At that point, the burden would shift back to the plaintiff to show that the defendant's proffered legitimate reason for the employment action was a pretext for an illegitimate, discriminatory motive. The alternatives to the *McDonnell Douglas* pretext scheme are those articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 269–70, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and the Civil Rights Act of 1991.

In *Price Waterhouse*, the four-justice plurality determined that mixed-motive cases required a different test than single-motive cases. *Id.* at 240 n. 6, 109 S.Ct. 1775. Instead of requiring the defendant to articulate a legitimate, nondiscriminatory reason for the employment action and requiring the plaintiff to prove that the proffered reason is a pretext for discriminatory motive, the defendant would have to show, by a preponderance of the evidence, that it would have made the same decision regardless of the plaintiff's membership in a protected class. *Id.* at 258, 109 S.Ct. 1775. This test has come to be known as "the same decision test." In her concurring opinion, now considered the controlling opinion, Justice O'Connor narrowed the reach of the four-justice plurality by concluding that the defendant should bear the burden of proof in mixed-motive cases only where the plaintiff has first presented direct evidence that the employer's "decisional process has been substantially infected by discrimination." *Id.* at 269–70, 109 S.Ct. 1775.

Subsequently, the Eighth Circuit instructed lower courts to analyze cases under either the *McDonnell Douglas* or the *Price Waterhouse* paradigm depending entirely on whether the plaintiff had presented direct or indirect evidence of discrimination:

The framework for evaluating a Title VII discrimination claim depends on the type of evidence presented in support of the claim. Where the plaintiff relies primarily on circumstantial evidence, courts apply a tripartite analysis as set forth in [*McDonnell Douglas* ] ....

In some situations, however, a plaintiff can produce direct evidence that an illegal criterion was a motivating factor in the disputed employment decision.... In those cases, the plaintiff is relieved of the ultimate burden of persuasion and the so-called "mixed motive" analysis is applied.

*Mohr v. Dustrol, Inc.* 306 F.3d 636, 639–40 (8th Cir.2002) (citing *Price Waterhouse,* (generally) and *Gagnon v. Sprint Corp.,* 284 F.3d 839, 847–49 (8th Cir.2002)). Only rarely did plaintiffs present direct evidence of a discriminatory motive. Thus, application of the *McDonnell Douglas* paradigm was much more common than the alternative burden-shifting scheme set forth in *Price Waterhouse* and revised by the Civil Rights Act of 1991.

Shortly after the Supreme Court issued its opinion in *Price Waterhouse,* Congress enacted the Civil Rights Act of 1991, which amended Title VII. The Civil Rights Act of 1991 states that a plaintiff satisfies its burden of proof when he "demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice." 42 U.S.C. § 2000e–2(m). In response, a defendant may avoid having to pay damages by proving an affirmative defense that it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e–5(g)(2)(B). Thus, instead of requiring the defendant to produce a legitimate, nondiscriminatory reason and then shifting the burden of proof to plaintiff to prove that this proffered nondiscriminatory reason was false and a pretext

for a discriminatory motive, the defendant bears the burden of proof on the "same decision test."

In *Costa v. Desert Palace, Inc.,* 299 F.3d 838 (9th Cir.2002), *cert. granted,* 537 U.S. 1099, 123 S.Ct. 816, 154 L.Ed.2d 766 (2003), the Ninth Circuit examined how the Civil Rights Act of 1991 affected the direct/indirect evidence distinction made by Justice O'Connor in her concurrence to *Price Waterhouse.* The Ninth Circuit questioned the validity of this distinction, noting that Congress intended to overrule the plurality opinion in *Price Waterhouse* when it enacted the Civil Rights Act of 1991:

> The legislative history evinces a clear intent to overrule *Price Waterhouse.* In a subsection titled "The Need to Overturn *Price Waterhouse,*" the report accompanying the 1991 Civil Rights Act reflects congressional concern that the "inevitable effect of the Price Waterhouse decision [was] to permit prohibited employment discrimination to escape sanction under Title VII."

*Costa,* 299 F.3d 838, 850 (quoting H.R.Rep. No. 102–40(I), at 46 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 584). The Ninth Circuit quoted the report further: "[t]he effectiveness of Title VII's ban on discrimination on the basis of race, color, religion, sex, or nation origin has been severely undercut by the recent Supreme Court decision in *Price Waterhouse v. Hopkins.*" *Id.* Because the Civil Rights Act of 1991 makes no mention of Justice O'Connor's direct/indirect evidence distinction, the Ninth Circuit concluded that Congress had nullified the distinction's legal effect. *Id.* (the legislative history shows beyond doubt "that the premise for Justice O'Connor's comment is wholly abrogated.... Consequently, there is no longer a basis for any special 'evidentiary scheme' or heightened

standard of proof to determine 'but for' causation.").

On June 9, 2003, the Supreme Court unanimously affirmed the Ninth Circuit, holding that a plaintiff need not offer direct evidence of discriminatory motive to proceed under a mixed-motive analysis. *Desert Palace,* 123 S.Ct. at 2155 ("we agree with the Court of Appeals that no heightened showing is required under § 2000e-2(m)"). Thus, the Supreme Court abrogated the direct/indirect evidence distinction articulated in Justice O'Connor's *Price Waterhouse* concurrence.

The Supreme Court based its decision on the fact that "the words of the statute are unambiguous" and that "the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence." *Desert Palace,* 123 S.Ct. at 2153. By abrogating the distinction made in Justice O'Connor's *Price Waterhouse* concurrence, the Supreme Court eviscerated the effect of the instruction to lower courts given by the Eighth Circuit in cases such as *Mohr* and *Gagnon.*

In this case, Gonzalez alleges discrimination on the basis of both disability and national origin under the ADA and Title VII. By alleging that the City considered multiple illegitimate motives, Gonzalez pled a mixed-motive case. Pursuant to the Supreme Court's decision in *Desert Palace,* the case must be analyzed according to the provisions of 42 U.S.C. § 2000e-2(m) and § 2000e-5(2)(B). In addition, Gonzalez brings retaliation claims under the FMLA. Finally, Gonzalez brings discrimination and retaliation claims under various state and city laws.

■ Federal anti-discrimination laws such as the ADA and the FMLA are patterned after Title VII, and as such should be evaluated similarly. For example, in *Buettner v. Arch Coal Sales, Inc.,* 216 F.3d 707, 713–14 (8th Cir.2000), the Eighth Cir-

cuit held that the *McDonnell Douglas* framework applies to retaliation claims under Title VII and the MHRA "[i]n the absence of direct evidence of discrimination." *See also, Gagnon,* 284 F.3d at 849–50. In addition, FMLA retaliation claims are subject to the same analysis as claims under Title VII. *Darby v. Bratch,* 287 F.3d 673, 679 (8th Cir.2002) (citing the Tenth Circuit decision in *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 208 (10th Cir.1997), which in turn cites the Tenth Circuit holding in *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997), which in turn cites the discussion in *Kaylor v. Fannin Reg'l Hosp., Inc.,* 946 F.Supp. 988, 999–1001 (N.D.Ga.1996), for "applying the analysis to an FMLA retaliation claim after a review of FMLA legislative history."). In *Kaylor,* the court stated that "Congress clearly contemplated that the proper framework for analyzing a retaliation claim based on circumstantial evidence under § 2615(a)(2) of the FMLA is the shifting burdens of proof analysis first established in [*McDonnell Douglas* ]" and noted that the retaliation provisions of the FMLA were "derived from Title VII ... and [were] intended to be construed in the same manner ...." *Kaylor,* 946 F.Supp. at 999. Thus, the Court will analyze Gonzalez's FMLA retaliation claim according to the allocations of burdens set forth in 42 U.S.C. § 2000e-2(m) and § 2000e-5(2)(B).

■ Similarly, the interests of uniformity require the Court to extend the burden-shifting paradigm articulated in 42 U.S.C. § 2000e-2(m) and § 2000e-5(2)(B) to ADA disparate treatment and retaliation claims. First, in *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135–36 (8th Cir.1999), the Eighth Circuit held that ADA disparate treatment claims are subject to the same analysis as Title VII claims and concluded that because Kiel did not offer direct evidence of a discriminatory motive, the Dis-

trict Court properly analyzed his claim under the *McDonnell Douglas* burden-shifting framework. In addition, the same analysis guides courts' consideration of retaliation claims under the ADA. *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir.1999). Finally, the ADA itself expressly adopts the procedures set forth in 42 U.S.C. § 2000e–5:

> The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117(a). Therefore, for the sake of uniformity and for the same reasons that the Eighth Circuit has previously and repeatedly held that courts should analyze ADA claims according to the same analysis that Title VII claims require, the Court will consider Gonzalez's ADA claims under the allocation of burdens set forth in 42 U.S.C. § 2000e–2(m) and § 2000e–5(2)(B). The City shall have an opportunity to file a motion for summary judgment on its affirmative defense under 42 U.S.C. § 2000e–5(2)(B), even though the dispositive motion deadline has passed.

■ Finally, the Court observes that while Gonzalez's federal discrimination claims follow the burden-shifting scheme articulated in the Civil Rights Act of 1991, courts must continue to follow the *McDonnell Douglas* framework for actions brought under the MHRA, the WCA, and MCRO. This is because, to this date, Minnesota law has not incorporated the holding in *Price Waterhouse* or the provisions of the Civil Rights Act of 1991. *See McGrath v. TCF Bank Sav., FSB*, 502

N.W.2d 801, 806 (Minn.App.1993) (citing *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626 (Minn.1988) (declining to follow the "same decision analysis" because it would defeat the broad remedial provisions of the MHRA)); *see also, Larsen v. Miller–Dwan Med. Ctr.*, Civ. No. 00–2017, 2001 WL 1325963, at *6 (D.Minn. Oct.2, 2001) (Magnuson, J.) (citing *Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–20 (Minn.1986) for the proposition that MHRA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting scheme); *Benson v. Northwest Airlines, Inc.*, 561 N.W.2d 530, 539 (Minn.Ct.App.1997) (*McDonnell Douglas* test applies to retaliation claims under the WCA). Given the similarities between the MCRO and the other state anti-discrimination statutes, the Court applies the *McDonnell Douglas* burden-shifting paradigm to Gonzalez's MCRO claims as well.

### C. Retaliation

Gonzalez brings a claim for retaliation under six statutes: the ADA, the FMLA, Title VII, the WCA, the MHRA, and the MCRO. Retaliation claims under each of the federal statutes follow the burden-shifting paradigm set forth in the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e–2(m), 2000e–5(2)(B). However, retaliation under the WCA, the MHRA, and the MCRO continue to follow the *McDonnell Douglas* burden-shifting framework, even for mixed-motive claims, such as Gonzalez's. The differences between *McDonnell Douglas* and the Civil Rights Act of 1991 do not effect the elements of Gonzalez's prima facie case of retaliation, however.

To establish a prima facie case of retaliation under each of the six federal and state statutes, Gonzalez must demonstrate: (1) that he participated in protected conduct; (2) that he suffered an adverse action; and (3) that the adverse action had a

causal connection to the protected activity. In this case, Gonzalez is unable to establish that causal connection with respect to Title VII, the ADA, the MHRA, and the MCRO. However, Gonzalez has created questions of fact with respect to each of the prima facie elements of retaliation for WCA and FMLA retaliation.

■ The prohibition against retaliation in Title VII, the ADA, the MHRA, and the MCRO exists to protect employees who complain about an employer's disparate treatment on the basis of disability, race, gender, or other classifications listed in Title VII, the MHRA, and the MCRO. These provisions do not protect employees from adverse decisions on the basis of that classification. In this case, Gonzalez does not allege that he suffered an adverse action because he *complained* about disparate treatment. Instead he alleges that he suffered an adverse action for *being* disabled and for *being* a Mexican–American. Gonzalez fails to create a question of fact on whether a causal connection exists between an adverse action and any protected activity, such as filing a complaint about perceived disparate treatment, because there is no evidence that Gonzalez ever participated in a protected activity. Therefore, his retaliation claims under Title VII, the ADA, the MHRA and the MCRO have no merit.

■ Gonzalez has also failed to create questions of fact on his prima facie case of FMLA retaliation. Gonzalez easily establishes the first element of his FMLA claim, that he participated in protected activity, because he filed for FMLA leave. The second element, that he suffered adverse actions, is not disputed. However, the parties disagree on whether a causal connection exists between Gonzalez's FMLA leave requests and an adverse employment action. To establish this element, Gonzalez relies solely on evidence showing that

he suffered an adverse employment action close in time to taking FMLA leave.

Timing alone may be enough to establish a prima facie case of retaliation in some situations. *Mitchell v. Iowa Protection & Advocacy Servs., Inc.*, 325 F.3d 1011, 1014 (8th Cir.2003) ("The requisite causal connection may be proved circumstantially by proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive.") (internal quotations omitted). However, the Court of Appeals has held that one month between the protected activity and the adverse action is too long to establish the third prima facie element. *See, e.g., Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832–33 (listing cases and concluding that two weeks "is sufficient, but barely so, to establish causation").

In this case, the record shows that Gonzalez took FMLA leave from November 14, 2000 to December 13, 2000. (Gonzalez Dep. Exs. 20, 21.) On December 26, 2000, less than two weeks after his FMLA leave expired, Gonzalez was "placed on sick leave restriction for one year." (Gonzalez Dep. Ex. 21.) On April 17, 2001, Gonzalez completed an FMLA leave request for April 2, 2001 through April 23, 2001. (Gonzalez Dep. Ex. 28.)

The City argues that the sick leave restriction is not an adverse action. Because "[e]mployment actions which do not result in changes in pay, benefits, seniority, or responsibility are insufficient to sustain a retaliation claim," *Buettner*, 216 F.3d at 715, the Court agrees. The City also claims that it did not receive the final FMLA leave request until after it had made the determination to discharge Gonzalez, a decision that occurred on April 20, 2001, (Bachun Aff. Ex. E at 2.). At one point in his deposition, in answer to the question, "[d]id you provide documentation to the city showing that you were incapaci-

tated before this April 20th meeting," Gonzalez responded, "I provided documentation, but I don't believe it was before that, no." (Gonzalez Dep. at 84.) At other points in his deposition, Gonzalez states that he did not know what day he gave the leave request form to the City. (Gonzalez Dep. at 87.) While Gonzalez sought to change his answers after his first deposition, when asked about what day he sent the leave request in his second deposition, he again could not remember whether it was on the 20th or the 23rd. (Bachun Aff. Ex. C (Gonzalez 2d Dep. at 268–72).) Therefore, Gonzalez is unable to create a question of fact on whether he participated in protected activity under the FMLA in April 2001. In conclusion, the record shows that Gonzalez's only protected activity under the FMLA was taking FMLA leave more than four months before the City decided to terminate his employment. Thus, there are no questions of fact as to whether there was a causal connection between Gonzalez's FMLA requests and any adverse employment action.

■ In contrast, Gonzalez raises issues of material fact on his prima facie case of retaliation under the WCA. The parties do not dispute whether Gonzalez filed workers' compensation claims, a protected activity under the WCA. The parties also do not dispute that Gonzalez ultimately suffered an adverse action. To support the third element of his prima facie case, Gonzalez offers evidence of retaliatory threats of termination for filing workers' compensation claims. (Gonzalez Dep. at 72–77 ("[Mike Kennedy] basically said if you file too many-too many, um, work-related injuries, you're basically going to get fired;" Mike Kennedy also allegedly stated that "if you file too many that you will probably in any event be terminated for it;" "[Michelle Iwanok, Jan Garber, Greg Kolinski, and Mary Page] basically threatened me

that I was going to be terminated if I kept missing work and filing claims;" "[Mary Page] said if I filed any more work comp claims she was going to basically fire me.").) Therefore, each of the three elements of a prima facie case of retaliation under the WCA have been met.

■ Under the *McDonnell Douglas* burden-shifting scheme, the City must now articulate a legitimate, nondiscriminatory reason for its employment decision. The City claims that Gonzalez was fired for tardiness, absenteeism, sick leave abuse, and violations of department rules, policies, and procedures. (Gonzalez Dep. Ex. 32.) At this point, the burden shifts back to Gonzalez to prove that the legitimate, nondiscriminatory reason is merely a pretext for a discriminatory motive. Gonzalez argues that he did not abuse the sick leave process and that his absenteeism and tardiness resulted from his work-related injuries. The Courts concludes that a question of fact remains on this point. At no point does the City argue that Gonzalez was dishonest about his injuries. Thus, the term "sick leave abuse" only refers to Gonzalez's penchant for filing numerous claims of work-related injury. In that way, the City's legitimate, nondiscriminatory rationale could simply be an employer-friendly label for adverse actions taken in response to protected conduct. Accordingly, fact issues remain on all relevant aspects of Gonzalez's WCA retaliation claim.

### D. Disability Discrimination

Gonzalez's disability discrimination claim includes allegations of harassment on the basis of disability and allegations of disparate treatment on the basis of failure to reasonably accommodate his disability. The disability harassment claim is discussed below in Part E. Gonzalez's complaint alleges that the City failed to accom-

modate his disability in violation of the ADA, the MHRA, the WCA, and the MCRO. However, the exclusive remedy provisions of the WCA, Minn.Stat. § 176.031, preclude a duplicate claim under the MHRA and the MCRO. *See Neumann v. AT & T Communications, Inc.,* Civ Nos. 01–1551 and 01–2339, 2003 WL 21147722, at *4 (D.Minn. May 8, 2003) (Magnuson, J.). Therefore, the Court considers Gonzalez's claims only under the ADA and the WCA, Minn.Stat. § 176.82, subd. 2. The difference between state and federal anti-discrimination law does not affect the Court's analysis on this claim because Gonzalez is unable to establish the third element of a prima facie case of disability discrimination under either statute.

To establish a prima facie case of disparate treatment on the basis of disability, Gonzalez must show that (1) he has a "disability" within the meaning of the ADA, (2) he is a "qualified individual" under the ADA, and (3) he "suffered an adverse employment action as a result of the disability." *Fenney v. Dakota, Minnesota & E.R. Co.,* 327 F.3d 707, 711 (8th Cir.2003). The parties dispute whether Gonzalez has a disability within the meaning of the ADA, whether he is a qualified individual, and whether the adverse action that he suffered was "as a result of the disability." Even assuming that Gonzalez could create questions of fact on the first two elements, he fails to establish the degree of causation necessary to satisfy the third element of a prima facie disability discrimination claim.

■ To survive summary judgment on his claim of disparate treatment based on disability, Gonzalez must do more than satisfy the definitions of "disabled" and "qualified individual" under the ADA. Pursuant to the third prima facie element, he must also present evidence sufficient to create a fact issue on whether his disability in any way motivated or caused his termination or other adverse action. In this case, Gonzalez presents very little evidence to satisfy the third element of his prima facie case.

In response to the City's motion, Gonzalez refers the Court to various paragraphs in his Amended Complaint and to his affidavit, in general. The four paragraphs from the Amended Complaint that Gonzalez cites in his Opposition Memorandum state that Gonzalez requested accommodations "[f]rom approximately1997 through May 16, 2001 ... including but not limited to job-restructuring, light duty work, reassignment, modified work schedule, and temporary leaves of absence." (Am. Compl.¶ 42.) The City in fact granted many accommodations to Gonzalez. Gonzalez's Complaint only alleges that the City "Refused to provide Plaintiff with reasonable accommodations in the Spring of 2001 and on May 16, 2001." (*Id.* ¶ 44.) Gonzalez has not specifically stated what accommodation he requested before April 20, 2001, when the City decided to terminate his employment. Nor has Gonzalez presented any evidence that he in fact requested an accommodation in the Spring of 2001, aside from his request for sick leave. The general allegations contained in Gonzalez's Complaint are insufficient to create a question of on the third element of his prima facie case of disability discrimination in light of the evidence presented by the City. Accordingly, the Court grants the City's Motion with respect to Gonzalez's ADA and WCA claim for disparate treatment of the basis of failure to reasonably accommodate his disability.

Finally, in his Opposition Memorandum, Gonzalez argues that he suffered several distinct adverse employment actions, including an alleged failure to promote and an alleged failure to allow him to partici-

pate in a return-to-work program. However, because neither of these two alleged adverse actions are mentioned in Gonzalez's Amended Complaint, the Court will not consider them in deciding the instant Motion.

### E. Hostile Environment Claim

 Gonzalez also brings a harassment claim, alleging that he faced a hostile work environment on the basis of disability and national origin. Again, the Court need not proceed beyond the initial prima facie case evaluation because Gonzalez is unable to create fact issues on the components of a prima facie case of hostile work environment. To succeed on a hostile environment claim, a plaintiff must prove four elements of a prima facie case: (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition, or privilege of employment. *Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir.2002). To actually alter the terms and conditions of employment, conduct must be severe and pervasive, both objectively and subjectively. *Woodland*, 302 F.3d at 843; *Duncan*, 300 F.3d at 934 (both cases citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Factors to consider when determining the severity and pervasiveness of an employer's conduct include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance. *Woodland*, 302 F.3d at 843; *Duncan*, 300 F.3d at 934.

 In this case, Gonzalez alleges that the City created a hostile work environment on the basis of his disability and national origin. The conduct in this case does not surpass the high threshold established in *Harris* for a hostile work environment claim. Gonzalez was called names like "fag," "wimp," "sissy," "useless," "worthless," and "spic." None of these allegations, however, rise above the requisite threshold for hostile work environment claims.

### F. Remaining Claims

#### 1. *National Origin Discrimination Claim*

 Gonzalez brings a claim for national origin discrimination pursuant to Title VII. However, Gonzalez fails to establish the fourth element of a prima facie case of national origin discrimination. A prima facie case of national origin discrimination is comprised of the following four elements: (1) that Gonzalez is a member of a protected class, (2) that he is qualified for the relevant position, (3) that there was an adverse employment action, and (4) that some evidence of record supports the inference of improper motivation. *See Hannoon v. Fawn Eng'g Co.*, 324 F.3d 1041, 1046 (8th Cir.2003). Gonzalez establishes the first element because the Code of Federal Regulations broadly defines nation origin discrimination "as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. The City does not seriously challenge elements two or three. Only the fourth element poses a problem for Gonzalez. Gonzalez presents no evidence that his national origin played any role is the City's decision to terminate his employment. Accordingly, summary judgment on this claim is appropriate.

### 2. *Negligent Retention/Supervision*

 Gonzalez argues that the City was negligent in supervising and retaining employees because it should have known that the some supervisors and employees had engaged in discriminatory conduct and retaliation and because it should have taken more steps to remedy and investigate Gonzalez's complaints of disability. In response, the City contends that the MHRA precludes recovery for alleged tortious conduct arising out of circumstances that also underlie a contemporaneous MHRA claim. The Court agrees. The exclusive remedy provisions of the MHRA preclude recovery of common-law claims based on the same facts. *Breitenfeldt v. Long Prairie Packing Co. Inc.*, 48 F.Supp.2d 1170, 1180 (D.Minn.1999) (Frank, J.) (citing *Williams v. St. Paul Ramsey Med. Ctr.*, 551 N.W.2d 483, 485 (Minn.1996); *Sullivan v. Spot Weld*, 560 N.W.2d 712, 717 (Minn. Ct.App.1997)). Therefore, the negligent retention and supervision claims are dismissed.

### 3. *Breach of Employment Contract*

 Gonzalez alleges that the City generally failed to follow the termination procedures contained in its employment contracts. (Am.Compl.¶¶ 110–12.) In his Opposition Memorandum, Gonzalez clarifies that this claim is based on two specific breaches: a failure to participate in the "Return to Work/Job Bank Program;" and the fact that the City and Gonzalez's union representative bypassed the "Step 2" meeting and proceeded directly to a "Step 3" meeting. The Court finds first that Gonzalez failed to meet the requirements of the Return to Work/Job Bank Program, and therefore, Gonzalez had no contractual entitlement to participate in this program. Second, according to the Labor Agreement between the City and Gonzalez's union, a claim only proceeds to Step 3, if Step 2 was "not satisfactory." Thus, Gonzalez incurred no loss or injury when the City bypassed Step 2. Therefore, summary judgment on Gonzalez's breach of contract claims is also appropriate.

## CONCLUSION

Gonzalez created a questions of fact on his claim of retaliation under the WCA (subdivision 1). However, he cannot establish questions of fact on the existence of a causal connection between the adverse action and the alleged protected activity necessary to survive summary judgment on his five remaining retaliation claims. Similarly, Gonzalez does not present evidence sufficient to survive summary judgment with respect to his disability discrimination claims, his hostile work environment claims, his national origin discrimination claims, his negligent retention claims, and his breach of contract claims.

Accordingly, **IT IS HEREBY ORDERED** that the City's Motion for Summary Judgment (Clerk Doc. No. 25) is **GRANTED in part** and **DENIED in part** as follows:

1. Defendant's Motion for Summary Judgment on Plaintiff's WCA, Minn. Stat. § 176.82, subd. 1, claim for retaliation is **DENIED;**

2. Defendant's Motion for Summary Judgment on Plaintiff's remaining claims is **GRANTED.;** and

3. In light of the Supreme Court's decision in *Desert Palace*, Defendant has until June 20, 2003, to file a motion for summary judgment on its affirmative defense to damages under 42 U.S.C. § 2000e–5(2)(B); if filed, Plaintiff has until June 27, 2003 to respond to the motion; Defendant has until July 3, 2003 to reply to Plaintiff's response.