William REGAN, Plaintiff,

v.

NATURAL RESOURCES GROUP,
INC. and Emily C. Grothe,
Defendants.

No. CIV.03–5670 PAM/RLE.

United States District Court,
D. Minnesota.

Nov. 23, 2004.

Marshall Howard Tanick, Teresa J. Ayling, Mansfield Tanick & Cohen, Mpls, MN, for Plaintiff.

Jeffrey B. Oberman, Leonard B. Segal, Oberman & Segal, LLC, Mpls, MN, for Defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court on Plaintiff's partial Motion for Summary Judgment and Defendants' Motion for Summary Judgment. For the reasons that follow, both Motions are granted in part and denied in part.

## BACKGROUND

Defendant Natural Resources Group, Inc. ("NRG") is a closely held corporation that provides environmental consulting services to the pipeline industry. Plaintiff William Regan was one of six individuals who founded NRG in November 1992. After NRG terminated him in 2003, Regan commenced this lawsuit.

Regan brings six claims against Defendants, including breach of common law fiduciary duty, violation of his rights as minority shareholder under Minnesota Statute § 302A.751, breach of a stock purchase agreement, age and disability discrimination under the Minnesota Human Rights Act ("MHRA"), and violations of the Family Medical Leave Act ("FMLA"). Defendants have counterclaimed, alleging that Regan committed fraud when seeking FMLA leave, breached the stock purchase agreement, breached his fiduciary duty, and engaged in unfairly prejudicial conduct to NRG and its shareholders, including Defendant Emily Grothe.

### A. NRG Stock Purchase Agreement

In 1995, NRG shareholders executed a stock purchase and shareholder control agreement ("Agreement"), which describes

how NRG will buy stocks from departing shareholders. (Ayling Aff. Ex. 8.) As Chief Executive Officer of NRG, Regan participated in the implementation of the Agreement and signed the Agreement both in his official capacity as CEO and in his individual capacity as a shareholder.

Article 3 of the Agreement references the possibility that NRG could terminate a shareholder's employment without cause. Specifically, a paragraph entitled "Involuntary Termination Without Cause" provides that NRG may terminate a shareholder for reasons such as a layoff. (*Id.* ¶ 3.3.1.4.) Throughout his employment, Regan knew the Agreement applied to him and understood that shareholders could be terminated without cause.[1]

Article 3 also addresses stock purchase options for departing shareholders. It gives NRG the option to buy the shares of a departing shareholder upon termination of employment. (*Id.* ¶ 3.3.1.) The Article also provides that if NRG does not exercise its option, then the shareholder may require NRG to purchase all of his shares. (*Id.* ¶ 3.3.2.) Under this provision, the option must be exercised by delivering written notice to NRG. (*Id.*)

Article 5 of the Agreement describes how the stock purchase price is calculated when either the shareholder or NRG exercises the buy-out option. It explains that the purchase price generally equals the number of shares held by the shareholder multiplied by "the fair market value per share of the Stock determined by appraisal as of the last day of the fiscal year of the Corporation immediately preceding ... the date of exercise of the option." (*Id.*

¶ 5.1.1.) One exception to this general rule exists: "no such appraisal shall be obtained if the Corporation has obtained an appraisal consistent with the requirements of this paragraph as of a date within the 12–month period preceding the Triggering Date."[2] (*Id.*) Prior to Regan's termination, NRG always had appraisals near the end of the year, and always used those appraisals in buy-outs of outgoing shareholders.

Article 5 also explains that a discount applies to the stock purchase price. Specifically, it states that the appraiser "shall apply an aggregate discount for lack of marketability, minority shares, and other relevant factors (without regard to the percentage of Stock owned by the selling Shareholder) of 30 percent." (*Id.*) Since 1994, shareholders at the annual shareholder meetings have voted on whether the discount is appropriate. While CEO, Regan raised the issue and moved to continue the application of the discount. Each year, the shareholders approved the application. Regan cannot recall any instance when the discount did not apply to the purchase of shareholder stock.

## B. Regan's Employment and Termination

Regan was president and CEO of NRG from 1992 through 2000. When Grothe became CEO at the beginning of 2001, Regan remained as president and Chief Operating Officer. The decision to remove Regan from the CEO position was based on an assessment that Regan lacked necessary leadership skills—an assessment that Regan does not dispute. By the end of 2002, Regan relinquished all administrative

---

1. In addition, NRG promulgated an employment policy, which provides that employment is at-will. (Segal Aff. Ex. 4.) Regan signed a written acknowledgment of his at-will employment status, stating: "I further understand that I am an employee at-will; meaning I can terminate my employment at any time,

for any reason, and that my employer has the same right." (*Id.* at Ex. 5.)

2. The Triggering Date is "the date of exercise of the Option giving rise to the purchase" of shares. (Ayling. Aff. Ex. 8 ¶ 5.1.1.)

positions and focused on billable work. Regan was removed from the board of directors in January 2003.

NRG faced financial difficulties in 2003, and attempted to reduce costs by decreasing its profit sharing contribution and cutting overtime. Matters worsened in April 2003 when a significant client suspended its consulting work, forcing NRG principals to consider several options, including salary reductions, work schedule changes, and labor force cuts. On April 21, 2003, the principals, including Regan, met to discuss the company's financial situation, and decided that NRG needed to take more action to reduce costs. The principals agreed that Grothe would meet individually with each principal to obtain recommendations of candidates to be laid off, and that they would reconvene in the afternoon. Grothe then surveyed each principal individually to identify employees whose positions were subject to elimination. The majority of principals identified Regan. In fact, Regan identified himself, reasoning that he had no work to do.

After tallying the results of her survey, Grothe informed Regan that he was "not going to make it through this." (Segal Aff. Ex. 12 at 269 (Grothe Dep.).) Regan responded that he had already discussed the layoff with his wife and did not want to "burn any bridges." (*Id.* at 251–52.) Grothe also advised Regan of his rights under the Agreement, and gave him a handwritten note that stated he would be paid for his NRG shares based on a market value of $76.68 per share less the 30% discount.

After their discussion, Grothe called all the principals together for a meeting. Regan choose not to attend the meeting and instead went home. At the meeting, Grothe announced, "Bill Regan is no longer with the firm." (*Id.* at 245, 249–50.) Regan returned to work the next day and packed up some personal items. Grothe

drafted a memorandum, which stated that Regan "has decided to leave the firm to pursue his many other interests and spend more time with his family. Although we will miss his daily presence in the office, he plans to stay in touch and will always be an integral part of the history and success of NRG." (Ayling Aff. Ex. 19.) Regan reviewed the memorandum and said that it was fine.

Regan now claims that he did not read the memorandum carefully, and that he did not resign. In addition, he claims that he had not indicated his willingness to be terminated. Rather, he maintains that he was merely acknowledging that he was willing to be considered for some type of temporary salary reduction or layoff until business improved. Regan's counsel also sent Defendants' counsel letters on April 29 and April 30, 2003, stating that Regan "has not been laid off" and that Regan remained employed by NRG. However, Regan told others, including a job recruiter and his psychologist, that his position had been eliminated and that he had been laid off.

After being notified of the layoff, Regan sought treatment from a psychologist, who faxed NRG letters on April 25 and April 28, 2003, requesting that Regan be placed on a five-week medical leave of absence for depression and anxiety disorder. NRG placed Regan on a leave of absence from April 24 to May 2. After that period expired, NRG notified Regan that he was terminated "as part of an economic layoff" effective May 2. The notification letter also informed Regan that Grothe would provide a proposal for the purchase of Regan's NRG stock. In response, Regan's counsel sent another letter on May 13, stating that Regan had not resigned and had not been laid off, but was instead on a medical leave of absence.

## C. Post–Termination Events

On June 23 and July 3, 2003, Regan's counsel sent letters to Defendants' counsel regarding the purchase of Regan's NRG shares.[3] The June 23 letter states:

> If NRG has terminated Mr. Regan, it is obligated to comply with the provisions of the Stock Purchase and Shareholder Control Agreement, including Article 5, which provides for a buy-out of his shares.... I would appreciate being informed if the company continues to maintain that Mr. Regan has been terminated and, if so, when it intends to comply with those provisions.

(*Id.* at Ex. 28.)

The July 3 letter states: "Mr. Regan is entitled to exercise his rights under the Buy–Sell Agreement. I am reiterating his decision to exercise his rights under the Buy–Sell Agreement." (*Id.* at Ex. 29.) Between receipt of the letters, Grothe requested that an appraiser revalue NRG. On July 17, 2003, the appraiser concluded that the value of NRG was $6,973,320 as of June 30, 2003, a decline of $937,180 in NRG's value since the November 2002 appraisal of $7,910,500. Of course, a corresponding decrease in the value of Regan's 22.1% equity in NRG resulted. Under the November 2002 appraisal, the market value of Regan's interest in NRG was $1,750,584. Under the June 2003 appraisal, the market value of his interest decreased to $1,541,103. Following the Court's grant of partial summary judgment to Regan in February 2004, the parties agreed that NRG would purchase Regan's stock for $1,075,476, which equaled the purchase price based on the June 2003 appraisal less the 30% discount. (*See* February 26, 2004, Order.)

## DISCUSSION

### A. Standard of Review

The parties move for summary judgment pursuant to Rule 56(c), which provides that such a motion shall be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. *Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings—it must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Regan's Breach of Contract Claim

Regan's breach of contract claim is based on NRG's alleged failure to pay Regan the amount required for the purchase of his shares under the Agreement. Both parties acknowledge that they are bound by the Agreement, but disagree on two issues. First, they dispute whether the November 2002 or June 2003 appraisal should apply to value Regan's NRG shares. Second, they disagree on whether the 30% discount should apply to the purchase of the shares. Regan seeks summary judgment that the November 2002 valuation is appropriate, and argues that the discount issue should be resolved at

---

**3.** Defendants changed counsel in June 2003. Thus, the June 23, 2003, letter was delivered to Defendants' former counsel, who forwarded the letter to Grothe. Regan's counsel also requested that the former counsel forward the letter to Defendants' new counsel. The July 3, 2003, letter was addressed to Defendants' new counsel.

trial. Defendants also seek summary judgment, arguing that the June 2003 value should be used and the 30% discount should apply as a matter of law. Because these issues are inextricably related, the Court will address both Motions together.

### 1. *The November 2002 Appraisal Applies*

The November 2002 appraisal of NRG valued the company at $7,910,500. Under that valuation, Regan had a per share value of $76.68, or a total interest of $1,740,310. Under the Agreement, the most recent appraisal within the past twelve months before a shareholder requests a buy-out controls. *See* Ayling Aff. Ex. 8 ¶ 5.1.1; *Gunderson v. Alliance of Computer Prof'ls*, 628 N.W.2d 173, 187 (Minn.App.2001) ("courts are required to honor shareholder agreements setting the purchase price of shares" unless the price is unreasonable); *see also* Minn.Stat. § 302A.751, subd. 2 (price determined in a shareholder agreement controls unless the price is unreasonable). When Grothe notified Regan of the impending layoff on April 21, 2003, she informed him that she would contact him with an offer for his shares. She also provided him with a handwritten note showing her valuation calculations based on the 2002 appraisal. After not hearing anything, Regan notified NRG on June 26 and July 3 that he wanted to exercise his rights under the Agreement.

■ Defendants argue that the June 26 letter was insufficient notice of Regan's intent to exercise his rights under the Agreement, as it "was mainly a request for documents." Def.'s Mem. of Law in Supp. of Summ. J. at 12 n.8. Their argument fails, as the letter unequivocally refers to portions of the Agreement relating to NRG's purchase of shares, and asks when NRG will be purchasing Regan's shares. The Agreement does not require that Regan use magic words to notify NRG of his intent to exercise his buy-out rights.

Only after Regan notified NRG of his intent to exercise his rights under the Agreement did NRG nefariously request another appraisal. The mid-year appraisal was unprecedented and clearly an attempt to dilute the value of Regan's shares. Because Regan notified NRG of his intent to exercise his buy-out rights on June 26, 2003, the November 2002 valuation must apply. Accordingly, Regan's Motion on this point is granted and Defendants' Motion on this point is denied.

### 2. *The 30% Discount Applies*

■ The parties also dispute whether the 30% discount should apply. Regan's experts opine that no discount is due because of the unfair manner in which Regan was ousted from the company and because the discount is arbitrary and not based on an applicable business valuation methodology. However, the Agreement does not provide for such exceptions. Under the clear terms of the Agreement, the discount applies as long as it is reasonable. *See Gunderson*, 628 N.W.2d at 187; *see also* Minn.Stat. § 302A.751, subd. 2.

The 30% discount is reasonable given the lack of marketability of NRG shares. *See Advanced Communication Design, Inc. v. Follett*, 615 N.W.2d 285, 291 (Minn. 2000) ("The basis for the marketability discount is that shares in a closely held corporation cannot be sold as readily as shares in a corporation with securities traded over an exchange or in an established market and therefore investors tend to pay less, and sometimes significantly less, for such shares.") (citation omitted). Application of the marketability discount would not result in an unfair wealth transfer to either party. Indeed, the record shows that Regan understood and believed that the discount would apply to the pur-

chase of departing shareholders' stock, consistently moved for the continued application of the discount at shareholder meetings, and applied the discount to the purchase and sale of other shareholders' shares. Thus, application of the discount is fair and equitable to all parties in this case. Accordingly, Defendants' Motion on this point is granted.

In short, Regan should have received $1,218,217 for his NRG shares.[4] On February 26, 2004, the Court ordered NRG to pay Regan $1,075,476. The Court now orders NRG to pay Regan another $142,741 for the purchase of his NRG shares.[5]

## C. FMLA Claims

■ Regan seeks summary judgment that NRG violated the FMLA by refusing to allow him to take a leave of absence and by retaliating against him after he requested FMLA leave. NRG also seeks summary judgment, arguing that the FMLA claims fail as a matter of law.

■ The FMLA provides an eligible employee with twelve workweeks of leave during any twelve-month period if he has a "serious health condition" that makes the employee unable to perform the functions of his position. 29 U.S.C. § 2612(a)(1)(D); *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8th Cir.2002). The FMLA prohibits an employer from interfering with an employee's right to take medical leave. 29 U.S.C. § 2615(a)(1). Any violation of FMLA or its regulations constitutes interference. 29 C.F.R. § 825.220(b). To establish an interference claim, Regan "need only demon-

strate by a preponderance of the evidence that he was entitled to the benefit denied." *Carlsen v. Green Thumb, Inc.*, Civ. No. 01–2076, 2004 WL 234406 at * 6 (D.Minn. Feb.4, 2004) (Tunheim, J.) (citing *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206–07 (11th Cir.2001)).

Regan alleges that NRG violated the FMLA by refusing to allow him to take a leave of absence. However, Regan does not dispute that NRG provided him with FMLA leave from April 22 to May 2, at which time Regan was laid off. If an employee is laid off while on FMLA leave, "the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off." 29 C.F.R. § 825.216(a)(1). Thus, NRG was not required to continue providing Regan with FMLA leave. Regan's interference claim therefore fails as a matter of law.

■ The FMLA also provides protection against retaliation for exercising FMLA rights. Specifically, it provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). To establish a prima facie case of retaliation, Regan must show that (1) he exercised rights afforded by the FMLA; (2) he suffered an adverse employment action; and (3) the adverse employment action had a causal connection to the protected activity. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir.2002). If the decision to terminate Regan was made before he re-

---

4. This amount equals the value of Regan's 22.1% interest in NRG based on the November 2002 appraisal less $522,093, the 30% discount.

5. NRG also brought a breach of contract counterclaim against Regan, maintaining that

it has been unable to complete the purchase of his shares. (*See* NRG Countercl. ¶¶ 29–32.) However, NRG purchased Regan's shares after this Court's February 2004 Order, subject only to a dispute about the purchase price. Because this Order resolves that issue, the breach of contract counterclaim is dismissed.

quested FMLA leave, Regan cannot meet the third prong of the prima facie case. *Gonzalez v. City of Minneapolis,* 267 F.Supp.2d 1004, 1012–13 (D.Minn.2003) (Magnuson, J.).

■ Regan requested FMLA leave on April 25, 2003—four days after Grothe informed him of the layoff, three days after Regan approved the layoff announcement, and a day after Regan told his psychologist that he had been laid off. These actions undisputably indicate that the termination decision was made and communicated to Regan on April 21. Regan now attempts to create a dispute of fact, claiming that he was "confused" and uncertain as to whether he was being terminated or just temporarily laid off. He relies on the letters his counsel sent to Defendants' counsel in April and May 2003, which argued that Regan had neither resigned nor been laid off. These letters directly conflict with Regan's own statements to a job recruiter and psychologist, and cannot create a genuine issue of material fact. *See Rountree v. Fairfax County Sch. Bd.,* 933 F.2d 219, 223 (4th Cir.1991) ("The arguments of counsel, absent any evidence such as sworn affidavits accompanying objections to a motion for summary judgment, fail to meet the evidentiary standard necessary to create a genuine issue of material fact.") (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). Moreover, whether Regan misunderstood the termination decision is irrelevant. The key issue is whether Grothe and other NRG principals held retaliatory motive when making the decision. *See Peebles v. Potter,* 354 F.3d 761, 770 (8th Cir.2004) ("retaliatory intent is the centerpiece of retaliation claims"); *Gonzalez,* 267 F.Supp.2d at 1012–13 (plaintiff's confusion as to whether he requested FMLA before the termination decision was made did not create a genuine issue of material fact).

Regan also argues that the actual termination was effected on May 2—after he requested the leave of absence. However, when the termination became effective is immaterial. *See Curby v. Solutia, Inc.,* 351 F.3d 868, 873 (8th Cir.2003) (limitations period begins to run when the challenged decision was made and communicated to the plaintiff, even if the effects of the decision do not occur until some future date or remain subject to change). Because the decision to terminate Regan was made and communicated to Regan before he requested FMLA leave, Regan cannot establish a prima facie case of retaliation. Accordingly, the Court grants NRG's Motion for Summary Judgment and denies Regan's Motion for Summary Judgment on the FMLA claims.

## D. Regan's Breach of Fiduciary Duty Claims

### 1. *Section 302A.751 Claim*

■ Regan alleges that NRG, by terminating his employment, violated Minnesota Statute § 302A.751 because he had a reasonable expectation of continued employment. Section 302A.751 allows the Court to grant equitable relief to a shareholder in a closely held corporation when the directors or those in control of the corporation have acted in a manner that is unfairly prejudicial toward the shareholder. Unfairly prejudicial conduct is "conduct that frustrates the reasonable expectations of shareholders in their capacity as shareholders or directors of a corporation that is not publicly held or as officers or employees of a closely held corporation." *Gunderson,* 628 N.W.2d at 184 (citing *Berreman v. West Publ'g Co.,* 615 N.W.2d 362, 374 (Minn.App.2000)). The Court must consider "the reasonable expectations of all shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corpo-

ration and with each other." *Id.* (quoting Minn.Stat. § 302A.751, subd. 3a). Whether a shareholder's reasonable expectation has been frustrated is essentially a fact issue. *Id.* at 186. Thus, summary judgment is appropriate only if no reasonable jury could find that the controlling shareholders frustrated Regan's reasonable expectations as a shareholder. *Id.*

■ Minnesota law protects a shareholder of a closely held corporation in the shareholder's capacity as an employee. *Id.* at 189–92. However, shareholder status alone does not create a reasonable expectation of continued employment and "[n]ot all expectations of continuing employment are reasonable." *Id.* at 190. Rather, the Court must consider several factors to determine whether the shareholder had a reasonable expectation of continued employment, including the controlling shareholder's need for flexibility to operate the business in a productive manner. *See id.* at 191.

■ Written agreements among shareholders or between shareholders and the corporation carry great weight in determining a shareholder's reasonable expectations. *See id.* at 185. Consequently, a written agreement specifically stating that the shareholder may be terminated without cause contravenes a finding that the shareholder had an expectation of continued employment. *See id.* at 190 ("shareholders who sign buyout agreements permitting termination of employment for any reason and obligating shareholder to sell their shares to the

corporation upon termination of employment would not likely have a reasonable expectation of continuing employment"); *see also* Minn.Stat. § 302A.751 ("written agreements, including employment agreements and buy-sell agreements ... are presumed to reflect the parties' reasonable expectations concerning matters dealt with in the agreements"). No reasonable jury could find that Regan had a reasonable expectation of continued employment. The Agreement, which Regan executed as both CEO and shareholder, clearly explains that Regan could be terminated without cause.[6] Similarly, the NRG employee policy manual stated that employment was at-will. Regan also signed a form acknowledging that he was an at-will employee. In addition, Regan admits that throughout his employment, he understood that he was an at-will employee who could be terminated with or without cause. Moreover, Regan himself terminated the employment of other shareholders, and testified that he understood that all shareholders were at-will employees.[7]

Regan claims that he changed his mind after he met with his counsel and now believes that shareholders should not be considered at-will employees. However, he never communicated that belief to his fellow shareholders. To be reasonable, an expectation of continued employment must be known and accepted by other shareholders. *Gunderson,* 628 N.W.2d at 190. Thus, Regan cannot rely on his after-the-fact belief.

---

6. This fact distinguishes this case from *Haley v. Forcelle,* 669 N.W.2d 48 (Minn.App.2003), wherein the Minnesota Court of Appeals expressly noted that no shareholder agreement was executed and the plaintiff was made promises of continued employment.

7. Regan retained Daniel Kleinberger, a professor of business law at William Mitchell School of Law, who concluded that a fact

issue exists as to whether Regan had a reasonable expectation of continued employment. (*See* Diebes Aff. Ex. 8 at 11–13.) The Court disagrees with Professor Kleinberger's conclusion because he erroneously discounted the effect of the written agreements that Regan executed, as well as Regan's past conduct, which clearly indicate that Regan did not have a reasonable expectation of continued employment.

The undisputed facts show as a matter of law that Regan did not have a reasonable expectation of continued employment. The Court therefore grants NRG's Motion for Summary Judgment on the § 302A.751 claim.

### 2. *Common Law Claim*

Regan claims that Grothe breached her common law fiduciary duty to Regan by "orchestrating" Regan's termination, refusing to transfer a life insurance policy to Regan's family, failing to arrange for the release of Regan's personal guarantee of NRG's line of credit with a bank, and attempting to devalue Regan's shares.

 Shareholders in a closely-held corporation owe each other a fiduciary duty of good faith and loyalty. *Berreman*, 615 N.W.2d at 370; *Pedro v. Pedro*, 489 N.W.2d 798, 801 (Minn.Ct.App.1992). This duty includes dealing "openly, honestly and fairly with other shareholders." *Pedro*, 489 N.W.2d at 801 (quoting *Evans v. Blesi*, 345 N.W.2d 775, 779 (Minn.Ct.App. 1984)); *see also Berreman*, 615 N.W.2d at 371 (fiduciary duty includes duty to disclose material facts). Officers and directors may be personally liable for a breach of fiduciary duty. *Triple Five of Minn. v. Simon*, 280 F.Supp.2d 895, 900 (D.Minn.2003) (Magnuson, J.).

#### a. *Termination*

 Regan claims that Grothe breached her fiduciary duty to him by "orchestrating" and devising a "bizarre procedure" to terminate him. He claims that she was too hasty in addressing the shaky financial ground on which NRG stood and pressured Regan to leave NRG. However, the evidence does not support these accusations. Rather, undisputed evidence shows that NRG principals, including Regan, agreed that Grothe would meet with each principal to obtain recommendations for layoff. In addition, the record shows

that six of seven principals, including Regan himself, identified Regan for a layoff. The record also shows that Grothe was candid with Regan and did not deceive him. Moreover, there is no evidence that Grothe coerced Regan into the layoff. Rather, undisputed evidence shows that Regan was aware of NRG's precarious financial situation and voluntarily "expressed willingness to make accommodations for the good of NRG." (Diebes Aff. Ex. 8 at 9.) Accordingly, Regan's breach of fiduciary duty claim based on his termination fails as a matter of law.

#### b. *Guarantee*

 Regan also claims that Grothe breached her fiduciary duty to him by failing to release him as a guarantor of a $225,000 bank line of credit. He also claims that NRG increased his exposure on the guarantee by later acquiring a subsidiary. Undisputed evidence shows that Grothe has attempted to release Regan from the guarantee with the bank. However, Regan has refused to sign a subordination agreement, a condition precedent imposed by the bank for his release. It would be inequitable to hold that Grothe breached her fiduciary duty to Regan because only he can ensure that he is released as guarantor. Moreover, Regan presents no evidence that Grothe has colluded with the bank or otherwise prevented Regan's release as guarantor. Accordingly, his breach of fiduciary duty claim on this point fails as a matter of law.

#### c. *Life Insurance*

 In addition, Regan claims that Grothe prevented the transfer of his life insurance policy to his family. After Regan left, Grothe offered Regan the life insurance policy. However, NRG believed that it should retain the life insurance policy until the debt issues between NRG

and Regan were resolved. In the meantime, NRG has continued to maintain the policy and pay the premiums and is now willing to transfer the policy to Regan's family as part of the final resolution of this case. Because Regan has not presented any evidence that he has been prejudiced by NRG's actions relating to the policy or any evidence that Grothe has acted in any other unfair manner relating to the life insurance policy, the Court finds no breach of fiduciary duty. Nevertheless, the Court orders NRG to transfer the policy to Regan's family, as Grothe previously promised.

#### d. *Mid–Year Appraisal*

■ Finally, Regan claims that Grothe breached her fiduciary duty to Regan when she obtained the mid-year appraisal knowing that it would result in the diminution of the value of Regan's shares in a buy-out. The Court agrees. Regan notified NRG of his desire to exercise his buy-out rights on June 23, 2003. At that time, Grothe had already calculated the value of Regan's shares based on the November 2002 appraisal, leading Regan to rely upon that appraisal. Grothe astuciously and unfairly obtained the mid-year appraisal in an effort to devalue Regan's shares. Accordingly, the Court finds that Grothe breached her fiduciary duty to Regan, and her Motion for Summary Judgment on this point is denied.

### E. Regan's Age and Disability Discrimination Claims

■ Regan alleges that NRG terminated him because of his age and disability. The MHRA prohibits discrimination against individuals based upon various protected classifications, including age and disability. *See* Minn.Stat. § 363A.08. NRG moves for summary judgment, arguing that Regan has not provided sufficient evidence to support his discrimination claims.

#### 1. *Age Discrimination*

■ To establish an age discrimination claim under the MHRA, Regan may prove discriminatory intent either through direct evidence or through circumstantial evidence in accordance with the tripartite framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 542 (Minn.2001).

■ Regan claims that a comment by NRG board member Mark Larson is direct evidence of discrimination. In February 2003, Larson remarked that NRG was top heavy and requested that NRG identify the ages of its decision makers. Regan claims that this comment indicates that the decision to select Regan for the layoff was motivated by Regan's age. Direct evidence is evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude in such a way that the fact finder may infer that the attitude was probably a motivating factor in the employer's decision. *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999). However, not all comments that may reflect a discriminatory animus are sufficiently related to the adverse employment action to support such an inference. *Id.* Remarks that are unrelated to the decisional process cannot support a discrimination claim. *Id.; Smith v. Data-Card Corp.*, 9 F.Supp.2d 1067, 1079 (D.Minn.1998) (Magnuson, J.) ("stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process are insufficient to establish a prima facie case"). The Court looks beyond the moment a decision was made to determine whether the statement played a role in the ultimate decision mak-

ing process. *Gagnon v. Sprint Corp.,* 284 F.3d 839, 848 (8th Cir.2002).

Larson made the remark two months before Regan was terminated. Regan presents no link between the comment and the termination decision. Furthermore, Regan presents no evidence that Larson manipulated the decision making process relating to the layoff. Accordingly, Larson's remark cannot support the age discrimination claim. *See Walton,* 167 F.3d at 427; *see also Simmons v. Océ–USA, Inc.,* 174 F.3d 913, 916 (8th Cir.1999)

■ Alternatively, Regan may present circumstantial evidence adequate to support his claim of age discrimination. Under the *McDonnell Douglas* paradigm, Regan first must show establish a prima facie case of discrimination by showing that: (1) he was a member of the protected class; (2) he was qualified for the position he held; (3) despite his qualifications, he was terminated; and (4) some additional evidence exists indicating that age was a factor in the termination. *Dietrich v. Canadian Pac. Ltd.,* 536 N.W.2d 319, 324 (Minn. 1995).[8]

■ As evidence that age animus motivated NRG's decision, Regan relies on Larson's remark and explains that he was the third oldest principal of NRG. Even taken as true, these facts are insufficient to satisfy the fourth prong of the prima facie case. The stray remark by Larson outside the decision making process is insufficient infer discrimination. *See Dobesh v. CBS Broad., Inc.,* No. A03–978, 2004 WL 771725 at *5 (Minn.Ct.App. Apr.13, 2004) (summary judgment proper when plaintiff's only evidence of age discrimination is two stray remarks). In addition,

Regan presents no evidence that a younger employee filled his position or absorbed his duties. To the contrary, the record clearly indicates that NRG faced a serious economic shortfall in 2003 after an economic downturn and loss of a major client. Regan himself agreed that measures had to be taken, acknowledged that he had no work to do, and expressed willingness accommodate NRG. Because Regan has presented no affirmative evidence that his age was a factor in the layoff decision, the Court grants NRG's Motion for Summary Judgment on Regan's age discrimination claim.

**2. *Disability Discrimination***

■ Regan contends that he suffers from depression that materially interferes with his ability to perform the major life activity of work. The gravamen of his claim is that NRG violated the MHRA by failing to accommodate his depression and by terminating him because of his depression.

**a. *Discriminatory Discharge***

■ Discriminatory discharge claims are generally analyzed under the *McDonnell Douglas* framework. *Hoover v. Norwest Private Mortgage Banking,* 632 N.W.2d 534, 542 (Minn.2001). Under that paradigm, Regan must first establish a prima facie case by showing that he: (1) was disabled within the meaning of the MHRA; (2) was qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) was replaced by a non-disabled individual. *Id.* Because Regan has presented no evidence that he was replaced by a non-

---

8. Regan disputes whether a true reduction-in-force occurred. However, he does not dispute that his position was eliminated, and that four other positions were eliminated as well. Accordingly, the Court relies upon *Dietrich,* a reduction-in-force case, which modi-

fies the fourth requirement of the prima facie case. *Dietrich,* 536 N.W.2d at 324 ("a work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company").

disabled individual, he cannot sustain a discriminatory discharge claim.

■ Moreover, Regan cannot bear the ultimate burden that he was terminated because of his disability. As a matter of law, an employer cannot be liable for a discriminatory discharge if the employer does not know of the disability when the termination decision is made. *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 629–30 (8th Cir.1995); *Lippman v. Sholom Home, Inc.*, 945 F.Supp. 188, 191 (D.Minn.1996) (MacLaughlin, J.).

*Lippman* is closely analogous to this case. In *Lippman*, the employer informed the plaintiff that he was terminated on March 14, but explained that he would be paid and could work until April 8. However, the employer warned that the termination would be immediate if the plaintiff was tardy or disruptive in the interim. Three days later, the employer asked the plaintiff to leave the workplace immediately. Two weeks after that, the plaintiff requested an unpaid leave of absence and informed the employer that he suffered from attention deficit disorder. After the employer did not respond to the request, the plaintiff sued, alleging that the employer failed to accommodate his attention deficit disorder and terminated him because of behavior caused by the disability. Finding that the decision to terminate the plaintiff was made and communicated to the plaintiff on March 14—nearly three weeks before the employer learned that the plaintiff had a medical problem—the Court refused to infer that the decision to terminate was motivated by the plaintiff's disability.

■ The same is true here. The decision to layoff Regan was made and communicated to Regan on April 21, 2004. Regan was not diagnosed with depression until April 24, 2004, nor did he discuss his depression with Grothe or other NRG principles prior to his termination. Never-

theless, Regan argues that NRG must have regarded him as disabled because it previously granted him a leave of absence for depression in 1997. The Court rejects this argument for several reasons. First, the argument is based on the incorrect assumption that a serious health condition under the FMLA equates to a disability as defined by the MHRA. *Cf.* 29 C.F.R. § 825.114(a) (defining "serious health condition"), *with* Minn.Stat. § 363A.03 (defining "disability"). Moreover, even assuming that NRG knew that Regan suffered from depression, the mere fact that NRG was aware of Regan's depression is insufficient to establish that NRG regarded Regan as disabled. *See Johnson v. Loram Maint, of Way, Inc.*, 83 F.Supp.2d 1007, 1012–13 (D.Minn.2000) (Magnuson, J.). There is no evidence in the record that indicates that NRG believed that Regan's depression materially limited his ability to work. Indeed, Regan performed satisfactorily from 1997 to 2003 and did not request any leaves of absence in the interim. Thus, to the extent that Regan's depression was known to NRG before April 21, 2004, when the layoff decision was made, it was not obviously manifested as a disability. The record does not indicate that Regan exhibited symptoms of depression or any other mental impairment from 1997 to 2003. An employer is not required to be clairvoyant. NRG "was not obligated to divine the presence of a disability" based on a leave of absence taken six years before the layoff decision. *Miller*, 61 F.3d at 630; *see also Cooper v. Olin Corp.*, 246 F.3d 1083, 1088–89 (8th Cir.2001) (plaintiff failed to survive summary judgment on disability discrimination claim even though she presented evidence that employer knew she suffered from episodic bouts of depression for more than thirty years because the depression did not substantially affect any major life activity).

Finally, even assuming Regan could prove that NRG knew Regan was disabled

when the layoff decision was made, Regan has submitted no evidence showing that NRG's articulated reasons for the termination were pretextual. *Spades v. City of Walnut Ridge,* 186 F.3d 897, 900 (8th Cir. 1999) (plaintiff's disability discrimination claim failed because plaintiff presented only conjecture and conclusion that the defendant's stated reason for discharging him was pretextual). The evidence shows that NRG faced a precarious financial situation and had just lost a major client, which resulted in Regan having no work to do. Regan himself recognized the problematic situation that NRG faced and identified himself as subject to the layoff. Consequently, Regan has failed to present evidence from which a reasonable jury could conclude that the decision to terminate his employment was based upon his disability.

b. *Reasonable Accommodation*

 To maintain a reasonable accommodation claim, Regan must also show that NRG knew of, and failed to reasonably accommodate, his disability. *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 784 (8th Cir.2004) (citing Minn.Stat. § 363A.08 subd. 6).[9] Regan did not request a leave of absence until April 25— four days after he was notified of his layoff. Before the leave request, Regan never informed Grothe or any other NRG principal that he was disabled, that he was suffering from depression or any other

mental impairment, that he needed a leave of absence, or that he needed any sort of accommodation. Because Regan did not request an accommodation until after the termination decision was made and communicated to him, he cannot sustain a reasonable accommodation claim. *See Conner v. Reckitt & Colman, Inc.,* 84 F.3d 1100, 1102 (8th Cir.1996); *Miller,* 61 F.3d at 630; *see also Scheiderich v. City of Minneapolis,* 2000 WL 1051976 at *3 (Minn.Ct. App. Aug.1, 2000) ("A threshold issue in claiming an employer failed to provide reasonable accommodation for a disability is whether the employee ever requested an accommodation").

Finally, Regan cannot make out a reasonable accommodation claim because he presents no proof that the requested accommodation would have allowed him to keep his job. *Cannice v. Norwest Bank Iowa,* 189 F.3d 723, 727–28 (8th Cir.1999). Regan's position was eliminated and he admitted that he had no work to do. Consequently, his disability discrimination claim fails as a matter of law and NRG is entitled to summary judgment.

F. **Defendants' Counterclaims**

 Defendants assert counterclaims for common law breach of fiduciary duty and violation of Minnesota Statutes § 302A.751, as well as misrepresentation. Essentially, Defendants argue that Plaintiff failed to act honestly with his fellow shareholders by fraudulently requesting an FMLA leave of absence.[10] Defendants

---

9. In a reasonable accommodation case, discrimination is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations. Consequently, the employer's intent is irrelevant, and the *McDonnell Douglas* framework does not apply. Rather, the plaintiff always bears the burden of persuasion that he has been the victim of disability discrimination. *Kammueller,* 383 F.3d at 788; *Peebles v. Potter,* 354 F.3d 761, 766–67 (8th Cir.2004).

10. The only basis asserted in the Counterclaims is that Regan requested and was granted FMLA leave after he volunteered for layoff. (*See* NRG Countercl. ¶¶ 24, 27, 35; Grothe Countercl. ¶¶ 24, 28.) However, in response to Regan's partial Motion for Summary Judgment, Defendants request that the Court allow them to amend their counterclaims to also include allegations that Regan committed fraud, breached his fiduciary duties, and acted in an unfairly prejudicial manner to other NRG shareholders by: (1) attempting to re-

rely heavily on the fact that Regan's counsel previously authored an article in a local magazine, advising employees whose jobs are in jeopardy to seek a leave of absence.

To sustain a misrepresentation claim, Defendants must show that Regan made a false statement with an intent to induce NRG to act or rely on the statement. *Rainforest Café, Inc. v. Amazon, Inc.*, 86 F.Supp.2d 886, 909 (D.Minn.1999) (Davis, J.). Similarly, to sustain the breach of fiduciary duty and unfairly prejudicial conduct claims, Defendants must show that Regan failed to deal with his fellow shareholders in an honest, fair, and reasonable manner. *Gunderson*, 628 N.W.2d at 185; *Pedro*, 489 N.W.2d at 801.

NRG offers no evidence that Regan concocted his depression or that his request for a leave of absence was otherwise deceitful. Regan's psychologist certified that Regan required a medical leave of absence. Furthermore, NRG never requested that Regan get a second opinion, and thereby waived its right to challenge the validity of Regan's request for a leave. *See* 29 U.S.C. § 2613(c)(i). Because NRG fails to present any evidence that Regan deceitfully requested a leave of absence, these counterclaims fail as a matter of law and Regan is entitled to summary judgment accordingly.

## CONCLUSION

Based on the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's partial Motion for Summary Judgment (Clerk Doc. No. 38) is **GRANTED in part and DENIED in part**; and

2. Defendants' Motion for Summary Judgment (Clerk Docket No. 41) is **GRANTED in part and DENIED in part**.

Because this Order disposes of all claims before the Court, **LET JUDGMENT BE ENTERED ACCORDINGLY**.

ceive a better buy-out agreement than was provided in the Agreement; (2) contending that the 30% discount to the purchase of his shares did not apply; (3) attempting to extract a large settlement by now claiming that he did not volunteer for a layoff; and (4) misrepresenting that he was still employed by NRG in May 2003. Because discovery has been closed for months, their request to amend their Counterclaims is denied. *See*

Fed.R.Civ.P. 15(a) (court may deny leave to amend pleading due to party's undue delay); *see also No. States Power Co. v. Fed. Transit Auth.*, 358 F.3d 1050, 1057 (8th Cir.2004) ("while we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment").